Joshua GEFFON, Edward R. Laslow, Irving Berger, and Richard Anthony Phillipon, individually and on behalf of all others similarly situated, Plaintiffs.

v.

MICRION CORPORATION, Nicholas P. Economou, Robert K. McMenamin, and David M. Hunter, Defendants.

No. 96–11596–REK.

United States District Court, D. Massachusetts.

Dec. 6, 1999.

Thomas V. Urmy, Jr., Shapiro, Grace & Haber, Boston, MA, Kenneth J. Vianale, Milberg, Weiss, Bershad, Specthrie & Ler-

ach, New York City, Aaron W. Tandy, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, for plaintiffs.

Mitchell H. Kaplan, Choate, Hall & Stewart, Boston, MA, for defendants.

## Opinion

KEETON, District Judge.

### I. Pending Matter

Pending for decision is Defendants' Renewed Motion for Summary Judgment (Docket No. 91, filed October 7, 1999) with Memorandum of Law in Support (Docket No. 92, filed October 7, 1999) and Affidavits of John R. Baraniak in Support (Docket Nos. 93 and 100, filed October 7, 1999 and November 17, 1999, respectively). Plaintiffs have filed an Opposition (Docket No. 96, filed November 5, 1999) with a Statement of Material Facts (Docket No. 94, filed November 5, 1999) and an Appendix to Plaintiff's Supplemental Local Rule 56.1 Statement of Material Facts (Docket No. 97, filed November 3, 1999). Defendants filed a Reply Memorandum (Docket No. 98, November 17, 1999) and an Affidavit of Ronald Opel in Support (Docket No. 99, November 17, 1999).

Both Defendants and Plaintiffs incorporate in their current Motion and Opposition their previous Rule 56.1 Statements and supporting memoranda (Docket Nos. 51, 50, 59 for Defendants and Docket Nos. 56 and 57 for Plaintiffs).

The court heard oral argument on Defendants' Renewed Motion for Summary Judgment (Docket No. 91) on November 23, 1999.

For the reasons explained in this Opinion, I conclude that summary judgment for Defendants is appropriate.

### II. Procedural Background

Plaintiffs brought this securities fraud action for themselves and as representatives of all persons who purchased stock in the Micrion Corporation (Micrion) during the class period of April 26, 1996 through June 24, 1996 against Defendants Micrion

and three of its officers: Nicholas Economou (Economou), Robert McMenamin (McMenamin) and David Hunter (Hunter). Plaintiffs allege that defendants made or were responsible for the making of statements that violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5 (1996). After discovery by both sides, defendants filed a Motion for Summary Judgment (Docket No. 48) that was denied by Order of September 24, 1998 (Docket No. 62). In denying defendants' motion, I made the following order:

> Defendants' Motion for Summary Judgment (Docket No. 48, filed June 1, 1998) is DENIED. This is a ruling based on defendants' failure to meet their procedural burden of showing that without doubt they are entitled to judgment as a matter of law. I have reached this determination without making any decision on any particular issue of law or fact that may be material to the terms of the final judgment to be ordered in this case.

Docket No. 62. This order was accompanied by a memorandum that contained the following "Notice to Parties":

> This Memorandum and Order places plaintiffs on notice that, even though the court has concluded that the present record does not support summary judgment against plaintiffs, the court will not allow this case to proceed to a jury trial until plaintiffs have identified factual issues for submission to the jury and have presented for the court's consideration a draft of each special question proposed by plaintiffs, suitably fashioned for inclusion in a verdict form for use in submitting the case to the jury on special questions only.

> If plaintiffs are unable to craft an appropriate factual question for the jury that the court is persuaded, on the record before the court, is genuinely in dispute and at least potential-

ly material to the outcome, the court will again consider whether it should order summary judgment for the defendants.

Docket No. 62 at 13–14.

After two intervening Case Management Conferences in which little progress was made in obtaining from plaintiffs' counsel a clarification of claims and legal and factual theories that would enable the court to determine whether plaintiffs could show a factually and legally supportable basis for submission of one or more issues to jury trial, defendants filed a renewed Motion for Partial Summary Judgment (Dockets Nos. 76 and 77).

In a Memorandum and Order issued September 21, 1999 (Docket No.89), I deferred ruling on Defendants' Motion for Partial Summary Judgment because of an apparent misunderstanding on the part of plaintiffs' counsel as to the effect of my previous ruling denying Defendant's Motion for Summary Judgment. At a pretrial conference on September 22, 1999, I gave a further explanation of my position, stated in the Memorandum of September 21, 1999, with regard to the burden plaintiffs had yet to meet in response to Defendants' Motion for Summary Judgment. See Docket No. 89 at 5–9. At that pretrial conference, I invited the defendants to refile their Motion for Summary Judgment so plaintiffs could then respond properly, taking into account my more thorough explanation of plaintiffs' burden in responding to a motion for summary judgment asserting grounds other than insufficiency of pleadings.

The remainder of this Opinion focuses on Defendants' Renewed Motion for Summary Judgment, which is based on a more amply developed factual record and added evidentiary proffers of the defendants and the plaintiffs.

### III. Factual Background

#### A. Distinctively High–Risk–High–Gain Deal

Micrion designs, manufactures and markets focused-ion-beam (FIB) systems, which are machines designed to extract ions from a liquid metal gallium source and then accelerate and focus the ions into a beam. Although Micrion had principally sold FIB systems in small quantities (only one machine per order, or sometimes two), in early 1996 Micrion was negotiating a large-scale sale of FIB systems to the Read–Rite Corporation (Read–Rite) for use in manufacturing the magnetic heads that record data on or retrieve data from disk drives in computers.

This potential deal involved inherent uncertainties and risks for both Micrion and Read–Rite. For example, a tremendous amount of money was at stake, both in Read–Rite's committing to purchase the FIB systems and in Micrion's committing to manufacture them. Each FIB system costs approximately one million dollars. Also, the application of the FIB system to this manufacturing process was new and Micrion had never manufactured its FIB systems in the quantities that Micrion and Read–Rite were contemplating in their negotiations. Risks of loss and possibilities of gain were magnitudes higher for both Read–Rite and Micrion than in any potential deal either had negotiated before.

In preparing for this deal and trying to minimize the risks involved, Micrion "ramped-up" its manufacturing capabilities by hiring new employees and equipping new manufacturing facilities.

Read–Rite, also contemplating the risks involved, suggested that it might pursue alternative technology to Micrion's FIB systems. It is disputed when and even if Read–Rite told this fact to Micrion. Also disputed is what Read–Rite meant by this comment: whether (i) Read–Rite was actually pursuing alternative technology or (ii) Read–Rite was not actually pursuing alternative technology but meant, instead, to make Micrion think it was pursuing alternative technology in order to encourage Micrion to work faster in fear of viable competition.

Plaintiffs' showing this genuine dispute of fact does not entitle them to a jury trial unless I conclude that this dispute of fact is material to the outcome. Plaintiffs have not called attention to any applicable law under which this genuine dispute of fact would be material, and I know of none.

When I insistently asked at oral argument on November 23, 1999 under what legal theory what evidence before me would support inferences favorable to plaintiffs, plaintiffs' counsel responded only with generalized references to all the evidence and all the arguments of law submitted. A possible inference to be drawn is that plaintiffs assert a fundamental right to go to a jury verdict on their class-action securities fraud claims on a generalized form of submission to the jury that would leave the parties, attorneys, trial judge, and appellate tribunals unable to determine precisely what findings the jury had made and what legal theory or theories the jury had applied if the jury returned a verdict for plaintiffs. For reasons explained in Parts IV–VIII of this Opinion, I reject that contention as well as each of the alternative arguments addressed by plaintiffs in their opposition to defendants' renewed motion for summary judgment.

## B. The Agreement Between Read–Rite and Micrion

Micrion and Read–Rite signed an Equipment Purchase Agreement (a redacted version of which is filed with Docket No. 58, filed August 20, 1998), dated February 9, 1996 but executed in March, 1996 (the Agreement). The Agreement involved 75 FIB systems but only committed Read–Rite to a "firm order" of 25 systems. *See* Agreement at ¶ 4a, Docket No. 100, Exhibit D at 3 (hereinafter "The Agreement at ¶ ___"). The Agreement states that

This Agreement shall constitute Buyer's written release for the first twenty-five (25) units of Equipment as listed on Exhibit A. Delivery dates for the remaining fifty (50) potential units shall be as described in written releases from Buyer, when and if issued.

The Agreement at ¶ 4a. The Agreement further provides:

c. *Acceptance by Seller.* Seller shall acknowledge in writing all purchase orders submitted by Buyer within three (3) business days after receipt. All purchase orders shall be deemed accepted at the end of such three (3) day period, or upon the date of Seller's acknowledgment, if sooner.

d. *Rescheduling.* Buyer may by written notice to Seller reschedule the delivery of a unit of Equipment at any time prior to thirty (30) days from the original delivery date therefor (as the same may be modified by a purchase order), or modify the delivery location; provided, however, that Buyer may not delay delivery in a given unit more than sixty (60)[sic] from the original delivery date without the prior written consent of Seller.

e. *Cancellation.* Buyer may cancel in whole or in part any purchase order, provided that Buyer gives Seller written notice thereof. At the time of such cancellation, Seller and Buyer shall meet promptly to develop a written mitigation plan (the "Mitigation Plan"), and shall therefore discuss in good faith the status of such orders, and the work and additional expense required to complete work-in-process units . . .

The Agreement at ¶ 4b–e (discussion of Mitigation plan and potential penalties omitted).

The Agreement ends with an attached Exhibit A, titled "Price and Delivery Schedule," at page 14 of the Agreement. That attachment (Exhibit A of the Agreement) describes the price for all the 75 units and the delivery schedule for the first 25 units subject to the "firm order" described in paragraph 4a of the Agreement. That attachment also states that

[t]his Agreement shall further constitute a non-binding "blanket order" for an additional fifty (50) units, for a total of seventy-five (75) units. Buyer shall have no obligation, however, to purchase any of said additional fifty (50) units except pursuant to written releases of same issued to, and accepted by, Seller, which releases must precede the delivery date(s) by not less than six (6) calendar months.

Exhibit A to The Agreement at p. 14 (quotation marks in the original).

## C. The Micrion Press Release of March 18, 1996

On March 18, 1996, Micrion issued a press release (the March Press Release), in which the company reported that it had "completed negotiation of a multiple-system purchase agreement valued at over $50 million." The press release stated that the Agreement was an extension of a previous order and that the "total order is now valued at over $60 million." This assessment of value was accompanied by a caution that the press release included "forward-looking statements" subject to "risks and uncertainties" discussed in the company's Form 8–K (the 8–K) filed on the same day. The 8–K continued to refer to the Agreement as involving an "order" but specified that the Agreement included provisions that allowed Read–Rite to "cancel issued purchase orders or to terminate the agreement for convenience." The stock price of Micrion did not rise on any of the four days following the March Press Release.

## D. The Micrion Press Release and the Conference Call of April 25, 1996

On April 25, 1996, Micrion issued another press release (the April Press Release), in which Economou stated that the company "booked an order worth over $50 million." "The total order is now valued at over $60 million, the largest order ever placed for FIB equipment." This release contained the same caution about "for-ward-looking statements" as the March Press Release and referred the public to the 8–K filed in March.

On the same day, Economou and Hunter held a conference call (the Conference Call) with securities brokers and industry analysts in which Hunter stated that Micrion's "backlog" was $72.9 million. An analyst with Hambrecht and Quist asked Economou how Micrion was defining its backlog and Economou responded:

Significant shipments would start in the second half of the calendar year. I wouldn't necessarily say that the rest of the order or whatever is left of the order would be in the first six months of our fiscal year. I think it will be a little more evenly distributed than that. *But it will certainly be within the twelve months starting from now.*

Docket No. 57, Ex. 2 at 4 (underscoring added). Again, this Conference Call was accompanied by the caution about forward-looking statements and referred the public to the 8–K filed in March.

## E. Later Events

The following day, Hambrecht and Quist issued a strong-buy recommendation for Micrion stock, titling its spot report, "It's a Really Big Story," and stressing Micrion's $72 million backlog and that this backlog represented a 409% increase over the previous quarter's backlog. The stock price, which had begun rising sharply on April 25, rose $5 per share on April 26.

On June 12, 1996, Dow Jones reports came out reporting weakness in the disk-drive industry and problems faced by Read–Rite. Micrion's share price fell steeply, apparently in response to the Dow Jones reports.

On June 21, 1996, a Read–Rite officer made contact with Economou and informed him that Read–Rite was canceling some of the units that had been released and was not going to order any of the other 50 machines covered by the Agreement. Thus, the Read–Rite officer limited

Read–Rite's commitment to purchasing 21 FIB systems from Micrion.

On June 24, 1996, Micrion issued a press release in which the company stated that deliveries under an "open order" had been postponed and that the backlog was then reduced to $21 million. Micrion's share price fell $3.25 or 21%.

### IV. Standard of Decision

#### A. The Summary Judgment Standard

Summary judgment should be granted only where the court, viewing the evidence in the light most favorable to the non-moving party, determines that no genuine dispute of material fact exists. *See* Fed. R.Civ.P. 56. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Then the non-moving party must demonstrate that "*every essential element* of its claim or defense is at least trialworthy." *Price v. General Motors Corp.,* 931 F.2d 162, 164 (1st Cir.1991) (italics in original).

#### B. Separable Decisions at Different Stages of this Case

I determined, in the Memorandum and Order of September 24, 1998, on the record then before me, that plaintiffs had proffered evidence that, had it been appropriate for me to decide for or against summary judgment on liability on that record, I would have decided that a genuine dispute of material fact precluded summary judgment. *See* Docket No. 62 at 9–12. Defendants do not reargue their position on that record. Instead, Defendants contend that it is now clear, even if it was not in September 1998 or earlier, that plaintiffs are unable to point to a triable jury issue as to the falsity or misleading nature of the statements at issue, or as to scienter, or as to any other issue bearing on whether plaintiffs can show liability. In

this Opinion, I apply the summary judgment standard to the full record now before me.

### V. Legal and Factual Complexity of This Securities Fraud Case

#### A. Elements of Securities Claims

■ To prove a 10b–5 claim against named defendants, ordinarily plaintiffs must show: (1) a false statement or omission by the defendants (2) of a material fact, (3) made with scienter, (4) reliance on that statement by the plaintiffs (or perhaps by investors in the market, as has been pled in this case), and (5) resulting injury. *See Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1216–17 (1st Cir.1996).

For further discussion of these elements, see Parts VI.C and VII of this Opinion.

#### B. The Alleged False Statements

##### 1. Identification of the Statements

Apart from the more sweeping and generalized legal theory of plaintiffs referred to in Part III.A of this Opinion, and other potential arguments stated before completion of discovery and no longer advanced now, the Plaintiffs focus their 10b–5 claim on the following three assertions attributed to Economou on behalf of Micrion: (1) "[W]e [Micrion] booked an order worth over $50 million for Micrion FIB systems . . ." (*see* April Press Release, Docket No. 57, Ex. 1 at 1); (2) Micrion has a "backlog" of seventy-two million dollars (*see* the Conference Call, Docket No. 57, Ex. 2 at 4); (3) "[The order] will certainly be [shipped] within the twelve months starting from now" (*id.*).

##### 2. Interpretation of the Statements

■ Plaintiffs' framing of the statements as identified in the paragraph immediately above includes attributions of meanings neither expressed nor indisputably implied in what Economou said in fact. For what Economou said in fact, *see, e.g.,* Docket No. 57, Ex. 2 at 1 ("I think you

are all aware that we had a very large order placed for manufacturing systems in the new production application for focused ion beams and because of that order our backlog has increased significantly. Dave Hunter is actually going to give you the precise number, but let me just say at this point that the number is more than $70,-000,000 at this point."). *See also* Docket No. 57, Ex. 4 at; *id.,* Ex. 1 at 1.

Plaintiffs glide quickly from evidence of what was said in fact to plaintiffs' proposed interpretations of the strength of plaintiffs' asserted legal proposition that *interpretation is for the jury.* The law, however, does not support plaintiffs' legal position.

It is true that applicable law sometimes assigns to a jury the role and function of interpreting spoken, written, or printed statements. The law rarely if ever does so without guiding instructions of law however-er. And far more often applicable law assigns the role and function of interpretation either exclusively or at least primarily to the trial judge, in the first instance, subject to an ordinarily non-deferential review on appeal.

The largest body of precedent on this subject concerns spoken, written, or print-ed statements that are alleged to consti-tute a contract. *See, e.g., Den Norske Bank AS v. First Nat. Bank of Boston,* 75 F.3d 49, 52 (1st Cir.1996) ("Normally, con-tract interpretation is a question of law for the court."). *See also Fairfield 274–278 Clarendon Trust v. Dwek,* 970 F.2d 990, 993 (1st Cir.1992) ("Only if the contract is ambiguous is there an issue of fact for the jury.").

The underlying principles bearing upon interpretation of spoken, written, or print-ed statements extend also to the law gov-erning claims of misrepresentation and de-ceit and with distinctive force in relation to transactions in securities. In *Cooperman v. Individual, Inc.,* 171 F.3d 43 (1st Cir. 1999), a key issue was whether a corporate entity had a duty to disclose in a registra-tion statement the existence of a dispute within its governing Board as a result of which a key figure, Amram, who had been director, founder, chief executive officer, and president, departed from the corpo-rate entity. In reaching its decision rea-soned on grounds of a determination of materiality to investors of the existence of the dispute but no duty to disclose its existence in the registration statement, the Court of Appeals for the First Circuit de-clared:

> We next address defendants' chal-lenge to the district judge's determina-tion of materiality. Defendants argue that, even if the conflict between Amram and the majority of the Board existed at the time of the IPO, Individual's omis-sion of this conflict from the prospectus was immaterial as a matter of law.

> This court has delineated the bound-aries of materiality in the securities law context:

>> The mere fact that an investor might find information interesting or desir-able is not sufficient to satisfy the materiality requirement. Rather, in-formation is "material" only if its dis-closure would alter the "total mix" of facts available to the investor and "if there is a substantial likelihood that a reasonable shareholder would consid-er it important" to the investment de-cision.

> *Milton v. Van Dorn Co.,* 961 F.2d 965, 969 (1st Cir.1992) (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). We agree with the district court that it is substantially likely that reasonable in-vestors would consider the existence of a Board-level conflict over the future di-rection of the Company important to their investment decision.

> In reaching this conclusion, we are mindful of our role in making determina-tions of materiality:

>> Although materiality is a mixed ques-tion of law and fact which the trier of fact ordinarily decides ... if the al-leged misrepresentations or omissions

are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality [it is] appropriate for the district court to rule that the allegations are inactionable as a matter of law.

*In re Donald J. Trump Casino Securities Litig.,* 7 F.3d 357, 369 n. 13 (3d Cir.1993) (internal quotation marks and citations omitted). We cannot characterize the conflict between Amram and the Board as "obviously unimportant" to a reasonable investor.

*Cooperman,* 171 F.3d at 49.

I conclude that the matter of interpretation of statements such as those made by Economou is a matter for decision by the trial judge as matters of law are decided unless plaintiffs satisfy their burden of showing that some distinctive characteristics of their securities claims would warrant submission of a question of interpretation to the jury in this case.

## C. Interlocking Meanings of Economou's Statements

Part of the complexity of this case, and what I understand to be plaintiffs' difficulty in formulating any draft questions suitable for use in a jury verdict form, is that the meanings of the statements alleged to be false and misleading are interlocking. For example, whether a jury reasonably could find that the statement "booked an order worth over $50 million" is false and misleading may depend, in part, on several separate findings of factual premises, including (perhaps along with others) the following factual assertions:

(1) that the statement that "it will certainly be [shipped] within twelve months starting from now" modifies the term "the order";

(2) that the term "the order" means what an ordinarily prudent impartial observer of the market would understand it to mean;

(3) that "the market" as used in the context of this case means the interaction among potential buyers and potential sellers of stockholder interests in corporate entities that plan or develop focused-ion-beam (FIB) system technology;

(4) that the modifying phrase identified in (1) above gives to the term "the order" a precise meaning favorable to plaintiffs' contention of fraud on the market.

If this or a higher court decides that each of these proposed interpretations presents a question triable to a jury and that all of these four factual premises may be found in plaintiffs' favor, might Economou's statement including the phrase "within the twelve months starting from now" be reasonably interpreted to mean that all the "orders" in question had set delivery dates within twelve months from the date the statement was made? If so, then might the statements "booked an order" and "backlog" (a backlog being an accumulation of "orders") be found to be false and misleading? In other words, if a jury could be permitted to and does find that the statement "it will certainly be [shipped] within 12 months starting from now" means that all the "orders" Economou's spoke about had set delivery dates within the twelve months starting from the time the statement was made, might the jury apply that finding to their subsequent consideration of the understanding of a reasonable observer in the market and find Economou's statements (concerning "the orders", "booked an order" and "backlog") false and misleading? If this set of questions presents triable jury issues and a reasonable jury might or might not find the statements misleading in a way that would support a fraud-on-the-market-claim, neither side would be entitled to summary judgment on the liability issue.

On the other hand, if the only legally-and-factually permissible interpretation of Economou's statement including the phrase "within the twelve months starting from now" fails to support any of plaintiffs' claims, summary judgment is appropriate.

## VI. The Concept of An Impartial Market Observer

### A. Introduction

In Part V above, I have considered some but not all of the interlocking and intricately related inquiries that a court must consider in deciding whether a triable issue is presented by plaintiffs' evidentiary proffers in this legally and factually complex case. One useful, perhaps essential, inquiry by the court, in proceeding through other relevant inquiries, concerns what an appropriately tailored set of instructions about the applicable law would be if the case were being submitted to a jury. And it is thinking about precise drafting of an appropriately tailored set of rulings about the law governing these interlocking and intricately related inquiries that makes crafting a tentative jury verdict form a useful step of reasoning toward a decision on a motion for summary judgment in this factually complex case.

A necessary first step toward crafting a suitable verdict form for this case is a clarification of the objective element of the legal test applicable to the marketing of securities interests of the type involved in this case. I turn next to using the concept of an impartial market observer as an approach to this problem.

### B. Formulating the Concept of An Impartial Market Observer

Legal tests are often described as "objective" or "subjective" from the point of view of the person whose conduct is being judged (or an entity accountable for that person's conduct). From this point of view, without doubt, the legal test for deciding a dispute over contrasting contentions about interpretation of Economou's statements of April 25, 1996, is partly "objective" and partly "subjective."

The legal test is "objective" to the extent that it requires the decisionmaker applying it to measure Economou's conduct by a test external to Economou. Thus, for example, it is "objective" to whatever extent it makes Economou (and Micrion) accountable in the marketplace for the ordinary meaning of the words and phrases Economou used in the context in which he spoke. This is the basic idea that Holmes, as a dissenter on the Supreme Judicial Court of Massachusetts, expressed with characteristic flair, in observing that when a man makes a representation not

in casual talk, but in a business matter, for the very purpose of inducing others to lay out their money on the faith of it .... he knows that others will understand his words according to their usual and proper meaning, and not by the accident of what he happens to have in his head, and it seems to me one of the first principles of social intercourse that he is bound at his peril to know what that meaning is.

*Nash v. Minnesota Title Ins. and Trust Co.,* 163 Mass. 574, 586, 40 N.E. 1039 (1895). *See also L.E. Waterman Co. v. Modern Pen Co.,* 235 U.S. 88, 94, 35 S.Ct. 91, 92, 59 L.Ed. 142 (1914) (in a trademark context, stating that "when the use of his own name upon his goods by a later competitor will and does lead the public to understand that those goods are the product of a concern already established and well known under that name, and when the profit of the confusion is known to, and, if that be material, is intended by, the later man, the law will require him to take reasonable precautions to prevent the mistake.").

Holmes did not persuade his colleagues on the Supreme Judicial Court in 1895, however, to adopt a principle as near to strict liability as he envisioned. Moreover, as the law has developed in the century since that time, it does not in fact hold a person accountable for "what he said," regardless of "what he meant." Instead, the legal test ordinarily applicable is "subjective" to some extent. Here, for example, it is "subjective" to the extent that it takes into account the particular characteristics of Economou at the time he spoke, including his degree of confidence (his state of

mind) about the accuracy of factual assertions and the likelihood of correctness of predictions (forward-looking assertions about whether shipment of products would be made and accepted "within twelve months" from the date he was speaking). Thus the legal test is "subjective" to the extent that it takes into account his "belief," his "good faith," and whether or not he intended investors in the marketplace to rely on his forward-looking assertions, and whether or not he intended to mislead or deceive.

Unlike a "negligence" "test," a legal test focusing on intent to mislead is not a test of "ordinary care." Also, it is even farther from being a test of strict liability. Because "ordinary care" is the most commonly used "objective" test, one risks being understood as referring to negligence if describing a legal test as "objective" without explaining that the particular "objective test" being invoked is one that is less demanding of the person whose conduct is being judged than an "ordinary care" test.

A clear explanation to jurors of the mix of objective and subjective components of the legal test they are required to apply is essential to jurors' understanding of the precise factual issues submitted to them. This is so in a submission under a general charge that guides them in arriving at a "general verdict." It is so, too, under special-issue submission.

When using a general verdict only rather than a verdict that answers a series of separable questions essential to disposition of a claim or defense, a court must give the jury a charge that requires them to think about both the "objective" and the "subjective" aspects of the applicable legal test in coming to a single answer of liability or non-liability. The total array of instructions required for a case as complex as this class action securities fraud case would be daunting, even after editing with the greatest of care to be clear, consistent, and correct. Using a Verdict Form requiring answers to a series of separable questions enables the court to break apart the total array of instructions into more easily understood parts. In this case, the objective components of the total array can be focused on the meaning of the market that is distinctively relevant to the claims and defenses asserted in this case, and the meanings of statements as they would be understood by an impartial "Market Observer."

The concept of a "Market Observer" is, of course, not the only way of explaining the "objective" part of the applicable legal test. But I find it an especially useful way of thinking through the complexities of the kind of case presented here.

A "Market Observer" is a hypothetical creature as surely as is an "ordinarily prudent person." An ordinarily prudent person is, by definition, never negligent, and never makes a careless mistake. *See, e.g.,* Seavey, *Negligence—Subjective or Objective?,* 41 HARV.L.REV. 1 (1927). No living human being is that flawless. Similarly, a "Market Observer" as I am using the concept in this analysis is never unfair, never partisan. A "Market Observer" is always impartial.

A "Market Observer" weighs impartially all of the clashing arguments for different interpretations of a set of statements in arriving at the meaning of each statement being evaluated. A "Market Observer" is sensitive to every material aspect of the context in which statements are made, but also sensitive to the necessity for using, when thinking about forward-looking statements, discriminating judgment about the different degrees of closeness of association of possibilities, suggested by a creative imagination, to events as they are likely to unfold. In this instance, I have used the concept of a "Market Observer" in the sense just explained in coming to a draft Verdict Form.

Also, I have used the concept of "intent to mislead." In the law of misrepresentation generally, and with even fewer exceptions or limitations in the law regarding securities transactions, "intent to mislead" has two elements, both of which must be

satisfied by a plaintiff claiming actionable misrepresentation. The first element is intent to induce reliance. As applied to claims against Economou (and against Micrion, grounded on Economou's statements) this means that Economou knew or had a purpose that the plaintiffs or class of persons including the plaintiffs would rely upon Economou's statement. The second element is that Economou knew with reasonable certainty or believed that the facts or forward-looking predictions were not correct. *See* RESTATEMENT (SECOND) OF TORTS, § 526; W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS §§ 8, 107, 109 (5th ed.1984).

In reasoning toward my decision on the Motion for Summary Judgment in this case, I have considered a draft Verdict Form and discussed it with counsel at the Case Management Conference and the final hearing on the Motion for Summary Judgment on November 23, 1999. The draft attached to this Opinion includes some refinements made with the benefit of that oral argument of November 23, particularly in relation to the questions on intent to mislead, reliance, and harm.

These efforts to probe more precisely into suitable instructions on the law regarding the applicable legal tests have led to formulating the following "Introductory Explanation of Phrases," suitable for inclusion in a Charge to a Jury, or in a Verdict Form, or both.

## C. Excerpts From a Draft Jury Verdict Form

### Introductory Explanation of Phrases

"The Market," as used in all of the questions that follow, means:

The interaction among potential buyers and potential sellers of stockholder interests

in corporate entities that plan or develop focused-ion-beam ("FIB") system technology.

"Market Observer," as used in all of the questions that follow, means:

An ordinarily prudent and impartial observer

of the behavior of willing buyers and willing sellers

of stockholder interests

in corporate entities that plan or develop focused-ion-beam ("FIB") system technology.

"The Order," as used in all of the questions that follow,

does not refer to the piece of paper or the electronic, oral, or other form of statement made in stating a request that something be shipped.

Instead, "the Order" means all of the items for all of the 75 FIB systems identified in the Equipment Purchase Agreement ("the Agreement") between Micrion and Read–Rite [entered into evidence as Exhibit ___].

"Some but not all items within the Order," as used in all of the questions that follow, means:

some but less than all of the items to be shipped that are identified in "the Order."

"Shipped," as used in all of the questions that follow, means:

Sent to Read–Rite

according to the terms of the Equipment Purchase Agreement.

"Booked," as used in all of the questions that follow, means booked requests in the following sense:

Recorded in Micrion's records

as products that have been requested by a buyer for shipment by Micrion, and

identified in Micrion's records of anticipated revenue from products identified in recorded requests from a buyer.

"Backlog," as used in all of the questions that follow, means:

The booked requests for shipment that have not yet been shipped at the time the size of the "backlog" is stated.

With this Introductory Explanation before the jury, the Verdict Form may appropriately include questions such as those immediately below, which are examples taken from the more nearly complete set of questions shown in the Verdict Form attached to this Opinion.

### *"It will certainly be within the twelve months from now"*

It is stipulated that Economou said publicly on April 25, 1996, that "it will certainly be within the twelve months from now."

All references to "Economou's statement" in Section I of the Verdict Form are to the statement "it will certainly be within the twelve months from now."

1(a). Did Economou's statement mean to a Market Observer that "the Order" will certainly be shipped within 12 months from April 25, 1996?

_____ Yes _____ No

1(b). To a Market Observer, did Economou's statement refer to all items of "the Order," or substantially all items of "the Order" that were not yet shipped when the statement was made?

_____ YES, we unanimously find that Economou's statement refers to all items of the Order.

_____ YES, we unanimously find that Economou's statement refers to substantially all items of the Order.

_____ No, we unanimously find that Economou's statement did not mean either of the above.

**If YES to 1(b), go to 1(c). Otherwise, skip to Section II.**

1(c). Was Economou's statement made with good faith and reasonable belief that all items or substantially all items of the order would be shipped within 12 months from April 25, 1996?

_____ Yes _____ No

**If NO to 1(c), go to 1(d). Otherwise, skip to Section II.**

1(d). Did Economou leave out of his statement any facts about the Agreement and the circumstances associated with the Agreement that Economou knew and a Market Observer would not have come to know in some other way?

_____ Yes _____ No.

**If YES to 1(d), go to 1(e). Otherwise, skip to Section II.**

1(e). Were any of the left-out facts also facts that a Market Observer, to a substantial likelihood, would have considered to be important in making investment decisions?

_____ Yes _____ No

**If YES to 1(e), go to both 1(f) and 1(g). Otherwise, skip to Section II.**

1(f)(1)(A). As to any of the left-out facts you found in answering YES to in 1(e), did Economou deliberately leave them out with intent to mislead persons who would be making investment decisions based in significant part on Economou's statement?

_____ Yes _____ No

**If YES to 1(f)(1)(A), go to 1(f)(1)(B). Otherwise, skip to 1(g).**

1(f)(1)(B). Did any of the plaintiffs rely upon the absence of those facts from Economou's statement? Answer YES or NO, and if YES, name in the blanks provided the person or persons as to whom you find reliance.

_____ Yes

_____

_____ No

**If YES to 1(f)(1)(B), go to 1(f)(1)(C). Otherwise, skip to 1(g).**

1(f)(1)(C). Do you find harm suffered from that reliance?

_____ Yes _____ No

1(g)(1)(A). As to any of the left-out facts you found in answering YES to 1(e), did Economou act with deliberate disregard for the interests of persons who would be making investment decisions based in significant part on Economou's statement from which Economou left out facts?

_____ Yes _____ No.

**If YES to 1(g)(1)(A), to go 1(g)(1)(B). Otherwise, skip to Section II.**

1(g)(1)(B). Did any of the plaintiffs rely upon the absence of those facts from Economou's statement? Answer YES or NO, and if YES, name in the blanks provided the person or persons as to whom you find reliance.

_____ Yes _____

_____ No

**If YES to 1(g)(1)(B), go to 1(g)(1)(C). Otherwise, skip to Section II.**

1(g)(1)(C). Do you find harm suffered from that reliance?

_____ Yes _____ No

### VII. Analysis of the Evidentiary Proffer in this Case

#### A. Plaintiffs' Position on Their Evidentiary Proffer

As noted in Part III.A of this Opinion, the parties were allowed substantial discovery after my denial of defendants' initial motion for summary judgment and made substantial additional evidentiary proffers in support of and in opposition to defendants' motion for summary judgment on which I am now ruling.

■ Apart from plaintiffs' claim of entitlement to a generalized form of submission that I have determined to be contrary to law, plaintiffs principal argument is that no "order" exists, according to ordinary usage, unless the buyer (here Read–Rite) is unconditionally committed to accepting and paying for a specifically stated quantity of a specifically identified product within a specifically limited time and at a specifically stated price and unless the seller is unconditionally committed to producing and shipping that quantity of that product within that time and at that price. That is not the law. Certainly a transaction proved to have all these characteristics would be an order, but a transaction having all these characteristics is only one of many legally recognized kinds of orders. This is a commonsense proposition that is consistent both with ordinary usage of the term "order" and with legally recognized usage. *Compare Mas–Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1217 (Fed. Cir.1998) (no "definite sale or offer for sale" made, and, therefore, no on-sale bar triggered, where prospective purchaser merely "provided a purchase order that was never filled" and where "no agreement was reached about the particulars" of the device to be purchased) *with Aerotronics, Inc. v. Pneumo Abex Corp.,* 62 F.3d 1053, 1060 (8th Cir.1995) (stating that " 'order', 'purchase order' and 'business booked' may be used interchangeably throughout the agreement or they may have meanings that are distinct from one another" and then determining that on the record before it the word "order" does not mean "purchase order" but that the "order" at issue may refer only to a request to supply goods or to an acceptance of an initial development program).

After failing to succeed on their first proposed definition of "order," plaintiffs fall back to a contention that even if no precedent on point can be found, I should accept their proposed policy grounds for deciding an issue of first impression in their favor because Congress and judicial precedents favor protecting expectations of buyers of securities. Plaintiffs argue that I should rule that extraordinarily high risks of loss to buyers of Micrion stock existed in this case because of the leading-edge nature of the research and development Micrion chose to undertake. Plaintiffs contend that this fact of extraordinarily high risk of loss to buyers should override all other considerations in this case. This contention too is unpersuasive.

In any context, this one included, to say that Congress and judicial precedents favor some stated position on an issue of public policy is to state only a small part of the whole truth. Issues of public policy are not one-sided. If only one position could be identified as supportable by reasonable argument, no "issue" in the ordi-

nary sense of that term would exist. At least two and often more than two reasoned positions can be identified on any issue of public policy. To be persuasive, plaintiffs' assertion that Congress and judicial precedents favor protecting expectations of buyers of securities must be supported by precise citations brought to bear in a reasoned way in any appraisal of clashing contentions. Plaintiffs have failed to make any showing of this kind in this case.

If this case is to be decided as one of first impression on a non-specific ground such as plaintiffs suggest, it must be done in a higher court, which in any event seems unlikely for reasons examined more fully in Part VII.B, immediately below.

### B. Applying the Law of Summary Judgment to Plaintiffs' Strongest Evidentiary Proffers

Despite my repeated requests for reasoned and specific explanation of their position, plaintiffs have failed to identify specific items of proffered evidence that would support interpreting Economou's statements as having a meaning of "order" that would support any of plaintiffs' claims on grounds beyond the contentions rejected in Part III above. Instead, plaintiffs have responded with generalized assertions that their interpretation of the meaning of "order" is supported by "all of the evidence appearing in submissions in this case." These submissions are quite extensive. The following categories of evidence are proffers that proceed farthest toward (but still falling short) of their goal of demonstrating that "order" means what they say it means in the market so as to satisfy (plaintiffs assert) the elements of a securities claim identified in Part V.A above.

1. *Evidence that a Market Observer understands Economou's statements regarding "orders" as only those with fixed delivery times:*

Docket No. 57, Ex. 15 at 110–12 (Deposition testimony of Gary Schwab, a stockbroker who evaluated Micrion stock for investor-clients, declaring that "an order is when a customer says, we want so many machines and it's going to be delivered on such and such a date . . . [The Agreement] looks to me like an order for 25 units.")

Docket No. 57, Ex. 15 at 124 (Deposition testimony of Gary Schwab, a stockbroker who evaluated Micrion stock for investor-clients, declaring that "the only order they had was for whatever that was, 25 machines. That was it. They had an order. They had delivery dates and that was it.")

Docket No. 93, Ex. O at 73 (Deposition testimony of Kathryn Griner, Expert Witness called on behalf of plaintiffs, declaring that "It's my view that when they put all the units into the backlog they went against their policy of putting units in of which they had scheduled delivery.")

Docket No. 93, Ex. O at 123–24 (Deposition testimony of Kathryn Griner, Expert Witness called on behalf of plaintiffs, declaring that backlog orders are those "believed to be firm and to be filled within the current fiscal year.")

Docket No. 100, Ex. B at 82 (Deposition testimony of David Hunter, the CFO of Micrion in 1996, stating previously that an " 'order' is a 'purchase order' and later that . . . [at times] the purchase order specifies a time period within which delivery will be made.")

Docket No. 100, Ex. B at 113 (Deposition testimony of David Hunter, the CFO of Micrion in 1996, stating previously that an "order" is a "purchase order" and later that "[a] signed purchase order . . . required a delivery date or an understanding of what the delivery terms were from that customer.")

2. *Evidence that a Market Observer understands Economou's statements regarding "orders" as only those orders that include cancellation penalties and/or mitigation plans*

Docket No. 57, Ex. 15 at 112–14 (Deposition testimony of Gary Schwab, a

stockbroker who evaluated Micrion stock for investor-clients, declaring that "A blanket order isn't subject to cancellation because it's not an order ... [The Agreement] looks to me like an order for 25 units.")

Docket No. 93, Ex. H at 88 (Deposition testimony of Mark Fitzgerald, a financial analyst at Hambrecht & Quist, who followed Micrion during the relevant time period, declaring that "a blanket order [is] a commitment by the customer to buy the product.")

Docket No. 93, Ex. O at 124, 129 (Deposition testimony of Kathryn Griner, Expert Witness called on behalf of plaintiffs, declaring that a purchase order would not be believed to be firm "if the company had some reason to believe it would be canceled" and "according to the SEC backlog orders ... only include orders in backlog which it believes to be firm.")

3. *Evidence that a Market Observer understands Economou's statement that "it will certainly be within 12 months" as made without good faith or reasonable belief that the order would be shipped within twelve months from April 16, 1996*

Docket No. 93, Ex. I at 97–98 (Deposition testimony of Nicholas Economou, President and CEO of Micrion in July, 1996, stating that Micrion was unwilling to take the risk of procuring parts or manufacturing machines without what amounted to a firm order for those machines, as defined in Paragraph 4a of the Agreement.)

Docket No. 57, Ex. 12 at 18 (Deposition testimony of Jeff Winsor, a Manager at Read–Rite) and Ex. 14 at 41–42 (Deposition testimony of Erich Pokorny, a Manager for Read–Rite) (both declaring that Micrion was experiencing technological difficulties in satisfying Read–Rite's criteria for acceptable FIB systems.)

Docket No. 57, Ex. 11 at 73–74, 79 (Deposition testimony of Rex Jackson, Read–Rite's general counsel, stating that Read–Rite was considering an alternative technology to use instead of Micrion's RIB systems and told Micrion that fact.)

Considered alone or together, these items of evidence are not sufficient to show a genuine dispute of material fact as to Economou's misleading or fraudulent use of the word "order" in the three statements at issue. These items of evidence, the most persuasive that plaintiffs have to offer, do not come close to creating triable jury issues for each of the elements of the securities claims that a jury would have to consider in their deliberations.

Thus, I conclude that, upon consideration of the evidence submitted in this case, no reasonable jury could find that the Agreement between Read–Rite and Micrion constitutes an "order," even as plaintiffs propose that the term "order" be interpreted. Instead, I conclude, as a matter of law, that the Agreement between Read–Rite and Micrion constitutes a "blanket order" for 50 FIB systems and a "firm order" of 25 FIB systems that are subject to the cancellation provisions in the Agreement and to the attached delivery schedule described in the Agreement's *Exhibit A*. I also conclude as a matter of law that Economou was not making an actionable misrepresentation in making his forward-looking statement of a combined total of an "order" for 75 FIB systems, 25 "firm" and 50 more as "booked."

### VIII. Guidance from *Greebel*

All of Parts III–VII of this Opinion have focused on the application of the summary judgment standard to the record before me at this time in this case, without any reliance upon recent securities law regarding heightened pleadings requirements. I have concluded, for the reasons explained in Parts III–VII, that defendants are entitled to summary judgment.

This conclusion is reenforced by consideration of *Greebel v. FTP Software Inc.* 194 F.3d 185 (1st Cir.(Mass.1999)), even

though that decision focuses upon heightened *pleading* requirements under Rule 9(b) of the Federal Rules of Civil Procedure and provisions of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4, to claims brought under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a).

Stating its conclusions in the second paragraph of its Opinion in *Greebel,* the Court of Appeals for the First Circuit declares:

1. The PSLRA imposes requirements for pleading with particularity that are consistent with this circuit's prior rigorous requirements for pleading fraud with particularity under Fed.R.Civ.P. 9(b).

2. The PSLRA mandates neither the adoption nor the rejection of particular patterns of evidence to prove fraud and scienter, and thus does not alter this circuit's prior law on these points.

3. The PSLRA does, significantly, impose a requirement that pleadings raise a "strong" inference of scienter rather than a merely "reasonable" inference of scienter.

4. The PSLRA does not alter the previous definition of scienter, one that in this circuit includes a narrowly defined concept of recklessness which does not include ordinary negligence, but is closer to being a lesser form of intent.

*Id.,* at 188.

The judicial reasoning applicable to imposing heightened pleadings requirements is at least as forceful, if not more so, with regard to proof requirements that a trial judge must consider in deciding whether to allow a motion for summary judgment. One may read subparagraph 2 of the foregoing quotation as supporting this assertion. I believe it to be generally recognized, in any event.

In the quotations from *Greebel* below that lend more legal support to my decision to allow defendants' Motion for Summary Judgment, I have omitted phrases that allude to pleadings requirements and substituted allusions to proof requirements.

> While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable, . . . *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Rather, inferences of scienter survive [a motion for summary judgment] only if they are both reasonable and "*strong*" inferences.

*Id.,* at 195 (footnote omitted) (emphasis in original).

> The categorization of patterns of facts as acceptable or unacceptable to prove scienter or to prove fraud has never been the approach this circuit has taken to securities fraud. . . . Instead we have analyzed the particular facts . . . [supported by evidentiary proffers] in each individual case to determine whether . . . [the evidentiary proffers] were sufficient to support [a triable issue on] scienter. *See, e.g., Shaw v. Digital Equip. Corp.,* 82 F.3d 1194. 1209 (1st Cir.1996). In this, the approach of this circuit has been like that taken by the Supreme Court as to the issue of materiality in *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

*Id.* at 196.

> The most salient feature of the PSLRA is that whatever the characteristic pattern of the facts . . . [proffered in evidence], those facts must now present a *strong* inference of scienter. A mere reasonable inference is insufficient to survive a motion . . . [for summary judgment].

*Id.* at 196–97 (emphasis in original).

> It is clear that scienter . . . [claims] must now be judged under the "strong

inference" standard at the motion ... [for summary judgment] stage.

*Id.* at 197.

> We have used a definition of recklessness articulated by the Seventh Circuit:
>
> > [R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it
>
> *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977) (quoting *Franke v. Midwestern Okla. Dev. Auth.*, 428 F.Supp. 719, 725 (W.D.Okla. 1976)).

*Id.* at 198.

> [The applicable] definition of recklessness does not encompass ordinary negligence and is closer to a lesser form of intent.

*Id.* at 199.

> We agree with those courts that hold that PSLRA did not address the substantive definition of scienter.

*Id.* at 200.

> [An inlet of the "safe harbor" provisions of the PSLRA] is of importance here. It focuses on the state of mind of the defendant and precludes liability for a forward-looking statement unless the maker of the statement had actual knowledge it was false or misleading.

*Id.* at 201.

### ORDER

For the foregoing reasons, it is ORDERED:

(1) Defendants' Renewed Motion for Summary Judgment (Docket No. 91) is ALLOWED.

(2) The Clerk is directed to enter forthwith on a separate document a Final Judgment as follows:

For the reasons stated in the Opinion of December 6, 1999, it is ORDERED:

Judgment for Defendants, with costs.

### Verdict

### Introductory Explanation of Phrases

"The Market," as used in all of the questions that follow, means:

> The interaction among potential buyers and potential sellers of stockholder interests
>
> in corporate entities that plan or develop focused-ion-beam ("FIB") system technology.

"Market Observer," as used in all of the questions that follow, means:

> An ordinarily prudent and impartial observer
>
> of the behavior of willing buyers and willing sellers
>
> of stockholder interests
>
> in corporate entities that plan or develop focused-ion-beam ("FIB") system technology.

"The Order," as used in all of the questions that follow,

> does not refer to the piece of paper or the electronic, oral, or other form of statement made in stating a request that something be shipped.
>
> Instead, "the Order" means all of the items for all of the 75 FIB systems identified in the Equipment Purchase Agreement ("the Agreement") between Micrion and Read–Rite [entered into evidence as Exhibit ___].

"Some but not all items within the Order," as used in all of the questions that follow, means:

> some but less than all of the items to be shipped that are identified in "the Order."

"Shipped," as used in all of the questions that follow, means:

> Sent to Read–Rite

according to the terms of the Equipment Purchase Agreement.

"Booked," as used in all of the questions that follow, means booke requests in the following sense:

Recorded in Micrion's records

as products that have been requested by a buyer for shipment by Micrion, and

identified in Micrion's records of anticipated revenue from products identified in recorded requests from a buyer.

"Backlog," as used in all of the questions that follow, means:

The booked requests for shipment that have not yet been shipped at the time the size of the "backlog" is stated.

### I. *"It will certainly be within the twelve months from now"*

It is stipulated that Economou said publicly on April 25, 1996, that "it will certainly be within the twelve months from now."

All references to "Economou's statement" in Section I of the Verdict Form are to the statement "it will certainly be within the twelve months from now."

1(a). Did Economou's statement mean to a Market Observer that "the Order" will certainly be shipped within 12 months from April 25, 1996?

_____ Yes _____ No

1(b). To a Market Observer, did Economou's statement refer to all items of "the Order," or substantially all items of "the Order" that were not yet shipped when the statement was made?

_____ YES, we unanimously find that Economou's statement refers to all items of the Order.

_____ YES, we unanimously find that Economou's statement refers to substantially all items of the Order.

_____ No, we unanimously find that Economou's statement did not mean either of the above.

**If YES to 1(b), go to 1(c). Otherwise, skip to Section II.**

1(c). Was Economou's statement made with good faith and reasonable belief that all items or substantially all items of the order would be shipped within 12 months from April 25, 1996?

_____ Yes _____ No

**If NO to 1(c), go to 1(d). Otherwise, skip to Section II.**

1(d). Did Economou leave out of his statement any facts about the Agreement and the circumstances associated with the Agreement that Economou knew and a Market Observer would not have come to know in some other way?

_____ Yes _____ No.

**If YES to 1(d), go to 1(e). Otherwise, skip to Section II.**

1(e). Were any of the left-out facts also facts that a Market Observer, to a substantial likelihood, would have considered to be important in making investment decisions?

_____ Yes _____ No

**If YES to 1(e), go to both 1(f) and 1(g). Otherwise, skip to Section II.**

1(f)(1)(A). As to any of the left-out facts you found in answering YES to in 1(e), did Economou deliberately leave them out with intent to mislead persons who would be making investment decisions based in significant part on Economou's statement?

_____ Yes _____ No

**If YES to 1(f)(1)(A), go to 1(f)(1)(B). Otherwise, skip to 1(g).**

1(f)(1)(B). Did any of the plaintiffs rely upon the absence of those facts from Economou's statement? Answer YES or NO, and if YES, name in the blanks provided the person or persons as to whom you find reliance.

_____ Yes

_____

_____

_____ No

**If YES to 1(f)(1)(B), go to 1(f)(1)(C). Otherwise, skip to 1(g).**

1(f)(1)(C). Do you find harm suffered from that reliance?

_____ Yes _____ No

1(g)(1)(A). As to any of the left-out facts you found in answering YES to 1(e), did Economou act with deliberate disregard for the interests of persons who would be making investment decisions based in significant part on Economou's statement from which Economou leftout facts?

_____ Yes _____ No

**If YES to 1(g)(1)(A), to go 1(g)(1)(B). Otherwise, skip to Section II.**

1(g)(1)(B). Did any of the plaintiffs rely upon the absence of those facts from Economou's statement? Answer YES or NO, and if YES, name in the blanks provided the person or persons as to whom you find reliance.

_____ Yes

_____

_____

_____ No

**If YES to 1(g)(1)(B), go to 1(g)(1)(C). Otherwise, skip to Section II.**

1(g)(1)(C). Do you find harm suffered from that reliance?

_____ Yes _____ No

## II. *Booked An Order Worth Over $50 Million*

It is stipulated that Economou stated publicly on April 25, 1996, that "we booked an order worth over $50 million for Micrion FIB systems to be used in a new production application."

All references to "Economou's statement" in Section II of the Verdict Form are to the statement "we booked an order worth over $50 million for Micrion FIB systems to be used in a new production application."

2(a). Did Economou's statement mean to a Market Observer that Micrion booked the Order?

_____ Yes _____ No

**If YES to 2(a), go to 2(b). Otherwise, skip to Section III.**

2(b). Would a Market Observer understand Economou's statement to mean that the Order was subject to a fixed delivery schedule?

_____ Yes _____ No

2(c). Would a Market Observer understand Economou's statement to mean that the Order was subject to cancellation penalties?

_____ Yes _____ No

**If YES to EITHER 2(b) or 2(c), go to 2(d). Otherwise, skip to Section III.**

2(d). Did Economou leave out of his statement any facts about the Agreement and the circumstances associated with the Agreement that Economou knew and a Market Observer would not have come to know in some other way?

_____ Yes _____ No.

**If YES to 2(d), go to 2(e). Otherwise, skip to Section III.**

2(e). Were any of the left-out facts also facts that a Market Observer, to a substantial likelihood, would have considered to be important in making investment decisions?

_____ Yes _____ No

**If YES to 2(e), go to both 2(f) and 2(g). Otherwise, skip to Section III.**

2(f)(1)(A). As to any of the left-out facts you found in answering YES to in 2(e), did Economou deliberately leave them out with intent to mislead persons who would be making investment decisions based in significant part on Economou's statement?

_____ Yes _____ No

**If YES to 2(f)(1)(A), go to 2(f)(1)(B). Otherwise, skip to 2(g).**

2(f)(1)(B). Did any of the plaintiffs rely upon the absence of those facts from Economou's statement? Answer YES or NO, and if YES, name in the blanks provided the person or persons as to whom you find reliance.

_____ Yes

_____

_____

_____ No

**If YES to 2(f)(1)(B), go to 2(f)(1)(C). Otherwise, skip to 2(g).**

2(f)(1)(C). Do you find harm suffered from that reliance?

_____ Yes _____ No

2(g)(1)(A). As to any of the left-out facts you found in answering YES to 2(e), did Economou act with deliberate disregard for the interests of persons who would be making investment decisions based in significant part on Economou's statement from which Economou left-out facts?

_____ Yes _____ No

**If YES to 2(g)(1)(A), to go 2(g)(1)(B). Otherwise, skip to Section III.**

2(g)(1)(B). Did any of the plaintiffs rely upon the absence of those facts from Economou's statement? Answer YES or NO, and if YES, name in the blanks provided the person or persons as to whom you find reliance.

_____ Yes

_____

_____

_____ No

**If YES to 2(g)(1)(B), go to 2(g)(1)(C). Otherwise, skip to Section III.**

2(g)(1)(C). Do you find harm suffered from that reliance?

_____ Yes _____ No

### III. *Micrion's Backlog*

It is stipulated that Economou stated publicly on April 25, 1996, that "because of that order our backlog has increased significantly. Dave Hunter is actually going to give you the precise number, but let me just say at this point that the number is more than $70,000,000 at this point."

All references to "Economou's statement" in Section III of the Verdict Form are to the statement that "because of that order our backlog has increased significantly. Dave Hunter is actually going to give you the precise number, but let me just say at this point that the number is more than $70,000,000 at this point."

3(a). Did Economou's statement mean to a Market Observer that due to the Order, Micrion's backlog is over 70 million dollars?

**If YES to 3(a), go to 3(b). Otherwise, do not answer any more questions. Your foreperson will sign and date the verdict form.**

3(b). Would a Market Observer understand Economou's statement to mean that the part of the backlog included in the Order was subject to a fixed delivery schedule?

_____ Yes _____ No

3(c). Would a Market Observer understand Economou's statement to mean that the part of the backlog included in the Order was subject to cancellation penalties?

_____ Yes _____ No

**If YES to EITHER 3(b) or 3(c), go to 3(d). Otherwise, do not answer any more questions. Your foreperson will sign and date the verdict form.**

3(d). Did Economou leave out of his statement any facts about the Agreement and the circumstances associated with the Agreement that Economou knew and a Market Observer would not have come to know in some other way?

_____ Yes _____ No.

**If YES to 3(d), go to 3(e). Otherwise, do not answer any more questions. Your foreperson will sign and date the verdict form.**

3(e). Were any of the left-out facts also facts that a Market Observer, to a substantial likelihood, would have considered to be important in making investment decisions?

_____ Yes _____ No

**If YES to 3(e), go to both 3(f) and 3(g). Otherwise, do not answer any more questions. Your foreperson will sign and date the verdict form.**

3(f)(1)(A). As to any of the left-out facts you found in answering YES to in 3(e), did Economou deliberately leave them out with intent to mislead persons who would be making investment decisions based in significant part on Economou's statement?

_____ Yes _____ No

If YES to 3(f)(1)(A), go to 3(f)(1)(B). Otherwise, skip to 3(g).

3(f)(1)(B). Did any of the plaintiffs rely upon the absence of those facts from Economou's statement? Answer YES or NO, and if YES, name in the blanks provided the person or persons as to whom you find reliance.

_____ Yes

_____

_____

_____ No

If YES to 3(f)(1)(B), go to 3(f)(1)(C). Otherwise, skip to 3(g).

3(f)(1)(C). Do you find harm suffered from that reliance?

_____ Yes _____ No

3(g)(1)(A). As to any of the left-out facts you found in answering YES to 3(e), did Economou act with deliberate disregard for the interests of persons who would be making investment decisions based in significant part on Economou's statement from which Economou left out facts?

_____ Yes _____ No

If YES to 3(g)(1)(A), to go 3(g)(1)(B). Otherwise, do not answer any more questions. Your foreperson will sign and date the verdict form.

3(g)(1)(B). Did any of the plaintiffs rely upon the absence of those facts from Economou's statement? Answer YES or NO, and if YES, name in the blanks provided the person or persons as to whom you find reliance.

_____ Yes

_____

_____

_____ No

If YES to 3(g)(1)(B), go to 3(g)(1)(C). Otherwise, do not answer any more questions. Your foreperson will sign and date the verdict form.

3(g)(1)(C). Do you find harm suffered from that reliance?

_____ Yes _____ No

## Final Judgment

### December 6, 1999

For the reasons stated in the Opinion of December 6, 1999, it is ORDERED:

Judgment for defendants, with costs.