Sandra KAFENBAUM and Steven Schulman, individually and on behalf of all others similarly situated, Plaintiffs,

v.

GTECH HOLDINGS CORPORATION, William Y. O'Connor, Stephen P. Nowick, and W. Bruce Turner, Defendants.

C.A. No. 00–413L.

United States District Court,
D. Rhode Island.

Sept. 4, 2002.

Barry J. Kusinitz, Esq., Famiglietti & Carlin, Providence, RI, Richard Weiss, Esq., Milberg, Weiss, Bershad, Hynes & Lerach, Joseph H. Weiss, Esq., James E. Tullman, Esq., Weiss & Yourman, New York City, Stepehn Moulton, Esq., Nancy Freeman Gans, Esq., Moulton & Gans, Boston, MA, for Plaintiffs.

Mark A. Pogue, Esq., Edwards & Angell, Providence, RI, William H. Paine, Esq., Jeffrey B. Rudman, Esq., Hale and Dorr, Boston, MA, for Defendants.

*Decision and Order*

LAGUEUX, District Judge.

This matter is before the Court on a Motion to Dismiss filed by defendant GTECH Holdings Corporation ("GTECH") and individual defendants William Y. O'Connor ("O'Connor"), in his capacity as former Chairman and Chief

Executive Officer ("CEO") of GTECH[1], Stephen P. Nowick ("Nowick"), in his capacity as GTECH's former President and Chief Operating Officer ("COO")[2], and W. Bruce Turner ("Turner"), in his capacity as Chairman of GTECH. This matter derives from a Class Action Complaint filed with this Court on August 25, 2000, by plaintiff Sandra Kafenbaum ("Kafenbaum"), representing an, as yet, uncertified class. Her Complaint alleged that defendant GTECH violated section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder. The Complaint also asserted claims made pursuant to section 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t(a), against individual defendants O'Connor, Nowick, and Turner.

On February 13, 2001, plaintiff filed an Amended Class Action Complaint adding Steven Schulman as a plaintiff; and, shortly thereafter, defendants filed a Motion to Dismiss the Amended Class Action Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b)(1).

In their Motion to Dismiss, defendants argue that the Amended Complaint must be dismissed for essentially two reasons. First, defendants argue that the Amended Complaint fails to satisfy the heightened pleading requirements contained in Federal Rule of Civil Procedure 9(b) and the PSLRA. Second, and relatedly, defendants contend that because the Amended Complaint does not satisfy the requirements of Fed.R.Civ.P. 9(b) and the PSLRA, plaintiffs cannot assert claims against the individual defendants.

For the reasons that follow, this Court denies the Motion to Dismiss as to the statements contained in the SEC filings and the May 2000 press release because plaintiffs have adequately alleged a securities fraud violation with regard to those statements. The Court, however, grants defendants' Motion to Dismiss as to the statements contained in the June and July 2000 press releases because they are not actionable statements. With regard to the plaintiffs' section 20(a) claims against individual defendants O'Connor and Nowick, defendant's Motion to Dismiss is denied. The Court, however, grants the Motion to Dismiss plaintiffs' section 20(a) claim against Turner.

## I.  BACKGROUND

Unless otherwise noted, the facts recited are drawn from the Amended Complaint.

GTECH is a publicly traded corporation with its principal place of business in West Greenwich, Rhode Island. GTECH supplies systems and services to lottery and gaming industries and engages in business not only in the United States but also in other countries, including the United Kingdom. GTECH's business contacts in the United Kingdom exist through its partnership with Camelot Group Plc. ("Camelot"), which operates the United Kingdom National Lottery ("the National Lottery").

Before April 1998, GTECH had a 22.5% equity interest in Camelot. In April 1998, however, GTECH agreed to sell its equity interest to Camelot for approximately $84.9 million. GTECH's agreement to sell its equity interest to Camelot provided, *inter alia*, that GTECH was required to return a portion of the $84.9 million if Camelot lost its operating license for reasons attributable to GTECH.

---

**1.** O'Connor was Chairman and CEO of GTECH until July 6, 2000.

**2.** Nowick was GTECH's President and Chief Operating Officer until July 6, 2000.

*GTECH's Decision Not to Disclose the Software Malfunction*

In June 1998, GTECH identified a malfunction in the software it provided to Camelot to operate the National Lottery. The malfunction caused a relatively small number of overcharges to lottery retailers by duplicating transactions resulting in overpayments or underpayments to certain prizewinners. In July 1998, GTECH corrected the software malfunction without revealing it to either Camelot or the United Kingdom National Lottery Commission ("the Lottery Commission"), the agency that operates the National Lottery.

*U.K. National Lottery Commission's Investigation of GTECH*

In May 2000, as part of its evaluation process to determine whether to renew its seven year contract with Camelot, the Lottery Commission conducted an investigation of GTECH. In its investigation, the Lottery Commission discovered not only the 1998 software malfunction but also GTECH's failure to disclose the malfunction and its correction of the problem. On August 23, 2000, after the conclusion of its investigation, the Lottery Commission decided not to renew its contract with Camelot. In a press release dated the same day, the Lottery Commission explained that it had decided not to accept Camelot's bid to run the National Lottery because GTECH's conduct had compromised the integrity of the lottery by not permitting anyone to make restitution to the prizewinners and retailers who were directly impacted by the software malfunction.

In the August 2000 press release, the Lottery Commission also stated that in April 1998, three months prior to GTECH's June 1998 discovery of the malfunction, the Lottery Commission had required GTECH to implement a Code of Conduct. Specifically, in April 1998, O'Connor, the then-Chairman of GTECH, and Nowick, GTECH's then-Chief Executive Officer, had given their personal assurances to the Lottery Commission that the Code of Conduct would be effective in an effort to improve GTECH's business practices. In July 2000, shortly after the implementation of the Code of Conduct, GTECH failed to disclose the software malfunction to either the Lottery Commission or Camelot. Based on these circumstances, the Lottery Commission decided not to renew its contract with Camelot.

Shortly after the Lottery Commission announced its decision not to renew Camelot's contract, Camelot appealed the decision to the Queen's Bench in London. On September 21, 2000, the Queen's Bench overturned the Commission's decision to reject Camelot's bid to continue operating the National Lottery and held that the Lottery Commission had to give Camelot an opportunity to bid for the contract. In December 2000, after some consideration, the Lottery Commission awarded the seven year license to operate the National Lottery to Camelot.

*Alleged Material Misstatements During the Class Period*[3]

Although the Lottery Commission ultimately awarded the contract to Camelot, this action was filed on August 25, 2000, against defendants, alleging that defendants materially mislead the investing public by issuing false and misleading statements which caused the price of GTECH's stock to become artificially inflated in violation of federal securities laws. On February 13, 2001, plaintiffs filed an Amended Complaint in which plaintiffs allege that

---

**3.** The Amended Complaint alleges that the Class Period runs from July 13, 1998, through August 29, 2000.

defendants made five material misstatements regarding the software malfunction in their filings with the Securities and Exchange Commission ("SEC") and in press releases in violation of Rule 10b–5 and § 20(a) of the Securities and Exchange Act of 1934.

The first statement alleged to be materially false was made in a 10Q filed with the SEC by GTECH on July 13, 1998. In the July 1998 10Q, GTECH stated:

> The Company's business is highly regulated, and the competition to secure new government contracts is often intense. Awards of contracts to the company are, from time to time, challenged by competitors. Further, there have been and continue to be investigations of various types, including grand jury investigations, conducted by governmental authorities into possible improprieties and wrongdoing in connection with efforts to obtain and/or the awarding of lottery contracts and related matters. *Although the Company does not believe that it has engaged in any wrongdoing in connection with these matters*, certain investigations that [*sic*] are conducted largely in secret and are still under way. Accordingly, the Company lacks sufficient information to determine with certainty their ultimate scope and whether the government authorities will assert claims resulting from these or other investigations that could implicate or reflect adversely upon the Company. *Because the company's reputation for integrity is an important factor in its business dealings with lottery and other government agencies, if government authorities were to make an allegation of, or if there were to be a finding of, improper conduct on the part or attributable to the Company in any matter, such an allegation or finding could have a materially adverse effect on the Company's business, including its ability to retain existing contracts and to obtain new or renewal contracts.* In addition, continuing adverse publicity resulting from these investigations and related matters could have such a materially adverse effect. (emphasis added).

Plaintiffs allege that defendants' denial of wrongdoing in connection with specified investigations was false and misleading at the time made because defendants knew the software malfunction had been concealed and could have a materially adverse effect on the Company's business if GTECH was unable to retain or renew its existing contracts or obtain new ones.

The second statement plaintiffs allege to be materially false and misleading appears in the 10K GTECH filed with the SEC on May 11, 1999. The 10K states in pertinent part:

> The Company's lottery contracts typically permit termination of the contract at any time for failure to perform and for other specified reasons and generally contain demanding implementation schedules and performance schedules. Failure to perform under such contracts may result in substantial monetary liquidated damages, as well as contract termination. Many of the Company's lottery contracts also permit the lottery authority to terminate the contract at will and do not specify the compensation, if any, to which the Company would be entitled should such termination occur. Certain of the Company's United States lottery contracts have contained provisions for up to $700,000 a day in liquidated damages for late system start-up and provide for up to $10,000 or more in penalties per minute for system downtime in excess of a stipulated grace period, and certain of the company's international customers (*most notably the United Kingdom's National Lot-*

*tery)similarly reserve the right to assess substantial monetary damages in the event of contract termination or breach.* (emphasis added).

Plaintiffs allege that this statement was materially false and misleading when made because it "omitted the substantial risks to the Company from the Camelot computer malfunction and defendants' subsequent cover-up."

The third statement plaintiffs allege to be materially false and misleading appeared in a press release issued by GTECH on May 30, 2000. In that announcement GTECH stated in relevant part that:

> [I]n light of an ongoing inquiry into a lottery terminal software malfunction in the United Kingdom, the Company has initiated a review to identify to what extent the specific malfunction may have occurred elsewhere in the world. The Company is verifying its terminal software applications for each of its lottery customers and the initial review shows that only a minority of other GTECH customers are or may have been affected.... The terminal software malfunction, which impacted only a fraction of transactions in the UK between 1994 and 1998, was identified by GTECH in the UK in June 1998 and corrected in July 1998.... "GTECH takes this matter seriously and accepts full responsibility for this lottery terminal software malfunction," said Steve Nowick, GTECH president and chief operating officer.

In their Amended Complaint, plaintiffs allege that this statement is materially false and misleading because it omits to state that GTECH concealed the software malfunction in 1998 and also minimizes the seriousness of the potential impact on GTECH's ability to retain its contract to operate the United Kingdom National Lottery.

The fourth statement plaintiffs allege to be materially false and misleading appears in a press release issued by GTECH to PR Newswire on June 22, 2000. In that press release GTECH discusses its business condition, noting both its increased revenues in the first quarter of fiscal year 2001 and the progress the company had made with its five strategic growth initiatives in the domestic and international markets. In the June 2000 press release, O'Connor, the chairman and CEO of GTECH states:

> *"We're on course to restore growth in the business driven in part by investing in our various businesses to build a platform for enhancing shareholder value."* (emphasis added).

Plaintiffs allege that this positive representation is materially false and misleading because GTECH conceals the pertinent facts about the United Kingdom Lottery.

Lastly, plaintiffs allege that defendants made a materially false and misleading statement in a press release issued on July 25, 2000. In that press release, GTECH announced lower than expected second quarter earnings for fiscal year 2001. Despite the decreased earnings, however, Turner, the Chairman of GTECH stated, *"We remain confident that our business is sound."* (emphasis added). Plaintiffs claim that this statement is materially misleading because it "falsely assured investors" that GTECH's business was "sound" when it allegedly was not.

In response to plaintiffs' allegations, defendants filed a Motion to Dismiss on April 26, 2001. In support of their Motion to Dismiss, defendants argue that plaintiffs have failed to (1) state a securities fraud claim because their allegations amount to nothing more than claims of corporate mismanagement; (2) plead adequately a securities fraud violation; and (3) state viable

claims against individual defendants O'Connor, Nowick, and Turner. Plaintiffs filed an objection to defendants' Motion to Dismiss on July 2, 2001, arguing that they had, in fact, alleged viable securities fraud claims against all defendants. On October 19, 2001, this Court heard oral argument on defendants' Motion to Dismiss and took the matter under advisement. The Motion is now in order for decision.

## II. STANDARD

### A. Standard for 12(b)(6) Motion

In deciding whether to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court must accept the facts alleged in the Complaint as true and construe those facts in the light most favorable to the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Knight v. Mills,* 836 F.2d 659, 664 (1st Cir.1987). A motion to dismiss pursuant to 12(b)(6) should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim which entitles plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### B. Heightened Pleading Requirement in Securities Fraud Actions

In addition to satisfying the Rule 12(b)(6) requirements set forth, *supra,* a securities fraud complaint must also satisfy the heightened pleading requirements contained in Fed.R.Civ.P. 9(b) and the PSLRA in order to survive a motion to dismiss. Federal Rule of Civil Procedure 9(b), which is applicable to, *inter alia,* fraud claims generally, provides that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). The PSLRA further clarifies the scope of Rule 9(b)'s requirement of partic-

ularity in securities fraud cases. Under the PSLRA, each securities fraud complaint must set forth (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) if an allegation is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. *See* 15 U.S.C. § 78u–4(b)(1).

In addition to complying with the requirements contained in Fed.R.Civ.P. 9(b) and the PSLRA, properly pleaded securities fraud complaints must also contain adequate evidence of scienter. In other words, plaintiffs' complaint must set forth adequate evidence that defendants consciously intended to defraud or that defendants acted with a high degree of recklessness.

The requisite level of evidence needed to maintain a securities fraud action is set forth in 15 U.S.C. § 78u–4(b)(2). Section 78u–4(b)(2) provides that "the complaint shall, with respect to each act or omission alleged ..., state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." In interpreting this provision of the PSLRA, the First Circuit has held that evidence of motive (i.e., " 'concrete benefits that could be realized by false statements and wrongful nondisclosure' ") and opportunity (i.e., " 'the means and likely prospect of achieving concrete benefits by the means alleged' ") coupled with additional factual support may be sufficient to establish a strong inference of scienter. *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 82 (1st Cir.2002) (citing *Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir.2000) (citations omitted)). These requirements—particularity and proof of scienter—serve not only to provide a defendant with fair notice of a plaintiff's claim of wrongdoing but also serve to protect a defendant against the

institution of a strike suit, a baseless claim brought by a plaintiff who later engages in extensive discovery to induce the defendant to settle rather than to discover relevant evidence of fraud. *See Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir.1997). With these principles in mind, the Court now turns to the merits of defendants' argument that plaintiffs' Amended Complaint fails to adequately plead a securities fraud claim.

## III. DISCUSSION

### A. Elements of a Securities Fraud Claim

Plaintiffs have brought this securities fraud action pursuant to 15 U.S.C. § 78j(b), commonly known as the Securities and Exchange Act of 1934. 15 U.S.C. § 78j(b) provides in pertinent part:

It shall be unlawful for any person ... [t]o use or employ in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate ... for the protection of investors.

15 U.S.C. § 78j(b). Pursuant to this authority, the Securities and Exchange Commission, promulgated Rule 10b–5, which makes unlawful the use of deceptive devices in connection with the purchase or sale of any security. Rule 10b–5 states in relevant part:

It shall be unlawful for any person ... [t]o employ any device, scheme, or artifice to defraud, or [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or [t]o engage in any act, practice, or course of business which operates or would oper-

ate as a fraud or deceit upon any person. . . .

17 C.F.R. § 240.10b–5. Therefore, in this case, in order to successfully pursue a claim made pursuant to Rule 10b–5, plaintiffs must demonstrate (1) that defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) that defendants acted with scienter; (3) that either plaintiffs or the market relied on the misrepresentation or omission; and (4) resultant injury. *Geffon v. Micrion Corp.*, 249 F.3d 29, 34 (1st Cir.2001) (citing *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216–17 (1st Cir. 1996)).

In their Motion to Dismiss, defendants allege that this Court should dismiss plaintiffs' Amended Complaint for three reasons. First, defendants claim that plaintiffs have failed to establish a claim under federal securities laws because the allegations against defendants amount to nothing more than claims of mismanagement. Second, defendants contend that plaintiffs have failed to meet the heightened pleading requirement imposed on securities fraud complaints by Federal Rule of Civil Procedure 9(b) and the PSLRA. Lastly, defendants argue that plaintiffs have failed to allege viable claims against individual defendants, O'Connor, Nowick, and Turner. The Court will address each of these contentions in turn.

#### 1. Failure to State a Claim

##### a. Claims of Mismanagement

In their Motion to Dismiss, defendants attempt to characterize plaintiffs' securities fraud action as a "mere claim of corporate mismanagement," which is not actionable under federal securities laws. Specifically, defendants argue that the essence of plaintiffs' claim is that GTECH's management "acted improperly" by cor-

recting the software malfunction without disclosing the malfunction or its correction to either the Lottery Commission or Camelot and, therefore, plaintiffs fail to state a claim under federal securities laws. The issue this Court must decide, therefore, is whether plaintiffs' allegations against defendants constitute more than claims of corporate mismanagement.

■ It is well-established in federal case law that a securities fraud complaint that does not contain either allegations of specific misrepresentations or omissions of material facts that were required to be disclosed, states nothing more than a claim of corporate mismanagement and therefore is not actionable under federal securities law. *See Haft v. Eastland Fin. Corp.*, 755 F.Supp. 1123, 1131 (D.R.I.1991) ("[f]ailing to disclose possible mismanagement ... does not state a federal securities law claim"). A claim of corporate mismanagement, however, *is* actionable when the complaint alleges that defendants (1) were aware that mismanagement had occurred and (2) made material public statements about the state of corporate affairs inconsistent with the existence of the mismanagement. *See In re Sirrom Capital Corp.*, 84 F.Supp.2d 933, 941 (M.D.Tenn.1999).

■ Here, viewing plaintiffs' allegations in the light most favorable to the them, this Court concludes that plaintiffs have alleged more than claims of corporate mismanagement. The Amended Complaint alleges that defendants not only failed to disclose specific information regarding the software malfunction to either the Lottery Commission, Camelot, or to investors but also made material misrepresentations about the same in public statements issued by the defendants. The gravamen of plaintiffs' Complaint, therefore, rests on defendants' alleged failure to disclose, fairly and fully, material information concerning the software malfunction and defendants' alleged concealment of the same in statements it issued to the public. *See Slavin v. Morgan Stanley & Co., Inc.*, 791 F.Supp. 327, 333 (D.Mass.1992) (stating that plaintiffs' "allegations constitute adequate claims under federal securities law because their essence lies in a failure of full and fair disclosure, not in a failure to manage the company well"). Accordingly, this Court concludes that plaintiffs' Complaint does not simply state claims of mismanagement but rather alleges conduct, which, if found to be true, violates securities laws.

b.   Sufficiency of the Pleadings

■ In addition to their mismanagement argument, defendants argue that plaintiffs failed to satisfy the heightened pleading requirements of Fed.R.Civ.P. 9(b) and the PSLRA. Specifically, defendants argue that this Court should grant their Motion to Dismiss because none of the five statements that plaintiffs allege to be materially false and misleading obligated defendants to disclose any information regarding the software malfunction. For the following reasons, this Court finds defendants' argument devoid of merit.

As mentioned previously, in order to survive a motion to dismiss, a securities fraud plaintiff must satisfy the heightened pleading requirements imposed on securities fraud complaints by Rule 9(b) and the PSLRA. This requires a securities fraud complaint to allege with particularity the "who, what, when, where, and why of each materially false or misleading misrepresentation or omission." *Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 232 (D.Mass.1999); *see also* 15 U.S.C. § 78u–4(b)(1). In this case, plaintiffs have satisfied this heightened pleading requirement. The Complaint sets forth the content of the five statements plaintiffs allege to be

false and misleading, the name of the speakers, the date on which the statements were made, the document in which each statement was made public, and a detailed explanation of plaintiffs' belief regarding why each statement is false. *See* 2d Am. Compl. ¶¶ 22–29, 31–33, 35, 37–40, 50–52.

■ Plaintiffs, furthermore, have adequately alleged scienter. At the pleading stage, a plaintiff's allegations of motive and opportunity coupled with some evidence of additional misconduct from which a jury can draw a reasonable inference of intentional deception is sufficient to satisfy the proof of scienter requirement imposed on securities fraud complaints. *See, e.g., Geffon v. Micrion Corp.,* 249 F.3d 29, 35–36 (1st Cir.2001). In this case, taking all the facts and circumstances into consideration, this Court concludes that the Amended Complaint contains adequate allegations which support a strong inference of scienter.

It is clear from the Amended Complaint that defendants not only had motive but also opportunity to withhold information regarding the software malfunction and their correction of the problem. First, plaintiffs have alleged a strong inference that defendants were motivated to conceal their identification and correction of the software problem both to preserve their $40 million contract with the Lottery Commission, which would have been placed in jeopardy as a result of their past misconduct, and to avoid paying an $84.9 million refund to Camelot if Camelot lost its operating license for reasons attributable to GTECH. Second, plaintiffs have adequately alleged opportunity. The individual defendants, as alleged by plaintiffs in their Amended Complaint, were in senior management positions and consequently in a position to have knowledge about the malfunction and the decision not to disclose it to the relevant parties and to control the dissemination of false information about the Company to the public in SEC filings and press releases.

In addition to demonstrating motive and opportunity, plaintiffs have adequately identified a number of facts that, taken together, create a strong inference of scienter. First, it is undisputed that in April 1998, a few months before the software malfunction occurred, GTECH had agreed to introduce and implement a Code of Conduct. The Lottery Commission had recommended the Code of Conduct, and GTECH agreed to implement it, in order to enforce proper corporate behavior, an issue GTECH had problems with in its past relationship with the Lottery Commission. Second, the April 1998 contract between Camelot and GTECH contained a provision stating that if Camelot lost its contract to operate the National Lottery for reasons attributable to GTECH, GTECH would be required to return a portion of the $84.9 million it had received from Camelot to purchase GTECH's equity interest in Camelot. Third, neither party disputes that in June 1998, GTECH identified a software problem that affected its operations in the United Kingdom and subsequently failed to disclose knowledge of the malfunction to either the Lottery Commission, Camelot, or GTECH's investors. Fourth, Turner, the current Chairman of GTECH, admitted in a July 6, 2000 press release that the software malfunction should have been disclosed. Thus, based on the facts alleged by plaintiffs in the Amended Complaint, this Court concludes that plaintiffs have adequately alleged scienter.

To conclude, on a 12(b)(6) motion in a securities fraud action, this Court's main concern is whether the allegations contained in the complaint satisfy the heightened pleading requirements imposed by Rule 9(b) and the PLSRA. Importantly, it

is not for this Court to evaluate the veracity of each allegedly false statement plaintiffs attribute to defendants. *See Kinney v. Metro Global Media, Inc.,* 170 F.Supp.2d 173, 179 (D.R.I.2001). Accordingly, having reviewed the allegations of fact and inferences contained in plaintiffs' Amended Complaint, this Court concludes that plaintiffs have sufficiently pleaded a securities fraud violation.

### c. Duty to Disclose

█ Defendants attempt to dissuade the Court from reaching the conclusion that plaintiffs' have adequately pleaded a securities fraud violation by arguing that they were under no obligation to disclose their knowledge of the software problem or their failure to disclose the same. Plaintiffs counter defendants' argument with a lengthy discussion of why defendants were, as a matter of law, required to disclose this information to the public. For the following reasons, this Court concludes that the issue of whether defendants had a duty to disclose information regarding the software malfunction and their concealment of the same is a question to be determined by a jury.

A defendant in a 10b–5 action cannot be held liable unless plaintiff first demonstrates that the defendant had a duty to disclose the alleged material information. *See Roeder v. Alpha Industs., Inc.,* 814 F.2d 22, 26 (1st Cir.1987). Under Rule 10b 5, " '[s]ilence, absent a duty to disclose, is not misleading. . . .' " *Backman v. Polaroid Corp.,* 910 F.2d 10, 13 (1st Cir. 1990) (citation omitted). A duty to disclose arises, however, where a corporation has previously made a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information. *Simon v. American Power Conversion Corp.,* 945 F.Supp. 416, 424 (D.R.I.1996) (citing *Gross v. Summa Four, Inc.,* 93 F.3d 987, 992 (1st Cir. 1996)). The determination of whether a defendant had a duty to disclose certain information, therefore, focuses on two interrelated inquiries: (1) whether the omitted fact itself is material and (2) whether the public statement is misleading. *See Simon,* 945 F.Supp. at 427.

In *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the Supreme Court defined materiality for purposes of securities laws violations. In *TSC,* the Supreme Court held that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC,* 426 U.S. at 449, 96 S.Ct. 2126. Whether an omission is 'material,' therefore, is a determination "that requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him. . . ." *Id.* at 450, 96 S.Ct. 2126; *see also Basic, Inc. v. Levinson,* 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (affirming the materiality standard set forth by the *TSC* Court and recognizing its applicability to 10b–5 actions). Thus, the issue of materiality is a mixed question of law and fact that involves the application of the legal standard to a certain set of facts. *TSC,* 426 U.S. at 450, 96 S.Ct. 2126.

The next step in the analysis is to determine whether the omission of the material fact makes the statement fraudulent or misleading under Rule 10b–5. This determination requires a court to examine the statement in light of the circumstances under which it was made. *See Craftmatic v. Kraftsow,* 890 F.2d 628, 642 (3d Cir. 1989). Thus, as one court stated succinctly: "[w]hether an omission is material and whether a statement is misleading are two interrelated, but separate, fact-specific in-

quiries, which generally cannot be resolved on a Rule 12(b)(6) motion to dismiss where all factual allegations must be accepted as true." *Freedman v. Louisiana–Pacific Corp.*, 922 F.Supp. 377, 388 (D.Or.1996). Consequently, a court can dismiss a securities fraud complaint *only* when the alleged misstatements or omissions are so patently inconsequential to a reasonable shareholder that reasonable minds could not differ on the question of their importance. *See Craftmatic*, 890 F.2d at 641.

Applying these principles to the statements contained in the SEC filings and the May 2000 press release, this Court cannot conclude, as a matter of law, that GTECH did not have a duty to disclose the software malfunction or their failure to disclose the problem. Indeed, given GTECH's past relationship with the Lottery Commission, this Court cannot conclude that GTECH's failure to disclose this information is "so patently inconsequential to a reasonable shareholder" that reasonable minds could not differ on its importance. *See id.* Accordingly, the issue of whether defendants' failure to disclose the software malfunction and its correction of the same is a material omission that makes the statements it issued materially misleading, is a question of fact to be decided by a jury and thus cannot be resolved at this stage of the litigation. *See Kinney*, 170 F.Supp.2d at 179 ("The question of whether or not the statements actually were materially false and misleading is one for a jury.").

In their Opposition to Defendants' Motion to Dismiss, plaintiffs attempt to persuade the Court to find that defendants had a duty to disclose the malfunction and its correction of the problem to shareholders, as a matter of law, by directing the Court's attention to *Simon v. American Power Conversion*, 945 F.Supp. 416 (D.R.I. 1996). In *Simon*, this writer reasoned that in that case defendants had an affirmative duty to disclose certain material information based on 17 C.F.R. § 229.303(a) and (b) ("Item 303"), which governs 10K and 10Q filings, respectively. Item 303 requires corporate management to disclose, *inter alia*, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations...." 17 C.F.R. § 229.303(a)(3)(ii).

In *Simon*, this Court explained that although Item 303 does not create a private right of action for a violation of an SEC regulation, it does impose, by its express terms, an affirmative duty on defendants to disclose material information. *Simon*, 945 F.Supp. at 431 n. 20. This Court further reasoned that because Item 303 imposed an affirmative duty on corporations to disclose material information, a corporation's nondisclosure of that information was actionable under securities law. *See id.*

In this case, based on the record before the Court, plaintiffs have not met their burden of demonstrating that defendants, in fact, violated Item 303. Whether defendants violated Item 303(a) and (b) cannot be determined on a 12(b)(6) motion because of the limited scope of the record before the Court. Importantly, even if plaintiffs are able to prove that defendants violated Item 303's disclosure requirements, a violation of those requirements does not necessarily lead to the conclusion that such disclosure would have been required under Rule 10b–5. As this Court noted in *Simon*, the disclosure rules are probative of what defendants are otherwise obliged to disclose but do not, themselves, provide an independent duty of disclosure. *See id.* at 431 n. 20; *see also Oran v. Stafford*, 226 F.3d 275, 288 (3d

Cir.2000) (stating that "a violation of [Item] 303's reporting requirements does not automatically give rise to a material omission under Rule 10b 5"); *In re Pacific Gateway Exch., Inc.*, No. C–00–1211 PJH, 2002 WL 851066 at *13 (N.D.Cal. Apr. 30, 2002); *Anderson v. Abbott Labs.*, 140 F.Supp.2d 894, 909 (N.D.Ill.2001). Accordingly, plaintiffs may not rely solely upon Item 303 to prove that defendants failed to disclose material information as a matter of law. An Item 303 violation is but one of many pieces of evidence the triers of fact must weigh to determine whether defendants failed to disclose material information in violation of Rule 10b–5.

In summary, the issue of whether defendants' statements, as contained in the SEC filings and the May 2000 press release, gave rise to a duty to disclose the software malfunction and defendants' failure to disclose the problem is a question of fact to be decided by a jury. Whether defendants violated Item 303's disclosure requirements cannot be determined based on the record before the Court and, in any event, does not necessarily prove a Rule 10b–5 violation.

#### d. Rosy Affirmations, or Corporate Puffery, Are Not Actionable

■ The statements made by defendants O'Connor and Turner in the June 22, 2000, and July 25, 2000 press releases, respectively, however, are not actionable as a matter of law. The First Circuit has generally declined to impose liability on corporate executives who make vague and optimistic statements—or rosy affirmations—about their company's outlook. *See Carney v. Cambridge Tech. Partners, Inc.*, 135 F.Supp.2d 235, 245 (D.Mass.2001). The First Circuit has recognized that these statements are not only "numbingly familiar to the marketplace" but also "so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the 'total mix of information available.'" *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir.1996).

In this case, the Court concludes that O'Connor's June 2000 statement that GTECH was "on course to restore growth in the business ...," and Turner's July 2000 statement that "[the company] remains confident that our business is sound" are exactly the sort of "rosy affirmations" that a reasonable investor could not have considered to be so significant as to alter the mix of information bearing on investment. *See Carney*, 135 F.Supp.2d at 245; *see also Fitzer v. Security Dynamics Techs., Inc.*, 119 F.Supp.2d 12, 23 (D.Mass. 2000) (noting that defendants' statements that the company was "well-positioned" are ultimately no more than nonactiobable "puffing"). Thus, the Court concludes that because the statements contained in the June and July 2000 press releases are corporate puffery, they are immaterial and thus not actionable as a matter of law.

#### B. Section 20(a) claims against O'Connor, Nowick, and Turner

■ As this Court noted in *Simon*, "[s]ection 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t(a), imposes joint and several liability on individuals who control an entity liable for violations of the securities laws." *Simon*, 945 F.Supp. at 435. Specifically, 15 U.S.C. § 78t(a) provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation ... shall also be liable jointly and severally with and to the same extent as such controlled person unless the controlling person acted in good faith and did not directly or indi-

rectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Thus, in order for plaintiffs' claims against the individual defendants to withstand defendants' Motion to Dismiss, plaintiffs must demonstrate: (1) a primary violation of the securities laws, and (2) that the individual defendants exercised control over the entity that engaged in the unlawful conduct. *See id.*

The Court has already determined that plaintiffs' Amended Complaint adequately pleads a securities fraud violation with regard to the statements contained in the SEC filings and the May 2000 press release. Plaintiffs, furthermore, have sufficiently alleged that O'Connor and Nowick, as former CEO and former COO, respectively, not only had general power but also exercised actual control over the management of GTECH. *See Aldridge,* 284 F.3d at 85. Indeed, O'Connor and Nowick were at the company's helm during the period of time that the software malfunction was discovered and senior management made an active decision not to disclose the problem to either Camelot or the Lottery Commission. In addition, plaintiffs' allege that O'Connor and Nowick made the false and misleading statements, as evidenced by their signatures on the various SEC filings that contain the statements at issue. *See In re Raytheon Securities Lit.,* 157 F.Supp.2d 131, 152–54 (acknowledging the survival of the "group-published information" doctrine[4] after the enactment of the PSLRA). Therefore, at this stage in the litigation, it would be inappropriate to dismiss plaintiffs' derivative liability claims against O'Connor and Nowick, and therefore, the Court denies the Motion to Dismiss as to these claims. *See, e.g., Simon,*

945 F.Supp. at 435 (denying defendants' 12(b)(6) motion as to plaintiffs' section 20(a) claims because "a number of the challenged statements are indeed actionable under 10(b)"); *In re Lernout & Hauspie,* 208 F.Supp.2d 74, 90–91 (D.Mass. 2002); *Chalverus,* 59 F.Supp.2d at 236 (stating that "[t]o the extent that a plaintiff sets forth a primary violation of the Exchange Act, dismissal of a section 20(a) claim for derivative liability is inappropriate").

■ The Court, however, grants the Motion to Dismiss plaintiffs' section 20(a) claim against Turner. Turner did not become Chairman of GTECH until July 6, 2000, and the only statement plaintiffs attribute to him is his statement that "business is sound" in GTECH's press release on July 25, 2000. The Court has already determined that this statement is immaterial and thus not actionable as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, this Court denies defendants' Motion to Dismiss as to the statements contained in the SEC filings and the May 2000 press release. The claims related to these statements satisfy the heightened pleading requirements contained in Rule 9(b) and the PLSRA, and therefore survive the instant motion. The Court grants defendants' Motion to Dismiss with regard to the claims concerning statements contained in the June and July 2000 press releases. The statements contained in the June and July 2000 press releases, respectively, amount to nothing more than corporate puffery, and therefore, are immaterial and thus not actionable as a matter of law.

4. The group-published information doctrine permits a plaintiff to impute false or misleading statements conveyed in annual reports, quarterly and year-end financial results, or other group-published information to corporate officers. *In re Raytheon,* 157 F.Supp.2d at 152.

In addition, plaintiffs' claims against individual defendants O'Connor and Nowick are still viable, and thus, defendants' Motion to Dismiss is denied as to plaintiffs' section 20(a) derivative liability claims against them. The Court, however, grants the Motion to Dismiss plaintiffs' section 20(a) claim against Turner because there are no actionable statements attributable to him.

It is so ordered.